## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**BETESFA, INC.,** a District of Columbia Corp**. d/b/a ABG MART**, and **BETELHEM KEBEDE GESESSE,** an Individual,

          Plaintiffs,

   v.

**UNITED STATES OF AMERICA**,

          Defendant.

CIVIL ACTION NO.  18-394 (RDM)

## PLAINTIFFS' RESPONSE AND BRIEF IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS OR,
## IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

     Plaintiffs, Betesfa, Inc., a District of Columbia Corporation d/b/a ABG Mart, and Betelhem Kebede Gesesse, an Individual, by and through their undersigned counsel, and file the following Response and Brief in Opposition to Defendant's Motion to Dismiss Plaintiffs' Complaint or, Alternatively, for Summary Judgment.  In support of this Response, the Plaintiffs respectfully refers the Court to the accompany Memorandum of Points and Authorities.

          Respectfully submitted,

Dated:  August 6, 2018

          *Andrew Z. Tapp*

          Andrew Z. Tapp, Esquire
          Florida Bar Number:  68002
          Pro Hac Vice
          Metropolitan Law Group, PLLC
          1971 W. Lumsden Road, #326
          Brandon, Florida 33511-8820
          Telephone:  (813) 228-0658
          Andrew@Metropolitan.legal
          Lajeana@Metropolitan.legal

          and

Stewart D. Fried, Esq.
D.C. Bar No.:  457801
Olsson Frank Weeda Terman Matz PC
600 New Hampshire Avenue, N.W.
Suite 500
Washington, DC 20037
Telephone:  202-518-6326
Fax: 202-234-3550
Email: sfried@ofwlaw.com

**COUNSEL FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on August 6, 2018, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will send notification of such filing to

the following:

Sherri L. Morgan, Esq.
Sherri.Morgan@usdoj.gov

*Andrew Z. Tapp*

Andrew Z. Tapp, Esquire
Florida Bar Number:  68002
Pro Hac Vice
Metropolitan Law Group, PLLC
1971 W. Lumsden Road, #326
Brandon, Florida 33511-8820
Telephone:  (813) 228-0658
Andrew@Metropolitan.legal
Lajeana@Metropolitan.legal

# **TABLE OF CONTENTS**

**Page(s)**

Table of Authorities ................................................................................ ii

I.      INTRODUCTION ....................................................................................1

        A.      Case History ...............................................................................1

        B.      Standards for a Motion to Dismiss.............................................2

II.     STATUTORY AND REGULATORY BACKGROUND .............................3

III.    PROCEDURAL AND FACTUAL BACKGROUND ..................................8

        A.      Procedural Background................................................................8

        B.      Current State of Discovery.........................................................10

        C.      Undisputed Facts.......................................................................12

        D.      Disputed Facts ..........................................................................12

IV.     STATEMENT OF FACTS: ALERT SYSTEM .......................................13

        A.      Statement of Fact:  The Plaintiffs' Business ...........................17

V.      AUTHORITIES PERTINENT TO THIS MOTION...................................18

        1.      Review of Administrative Decisions in SNAP Cases.........................18

        2.      On Point Case Law Pertaining to Early
                Motions for Summary Judgment...............................................19

        3.      Regulatory and Case Law Guidance ..................................20

        4.      Summary Judgment Standards ................................................23

VI.     ARGUMENT.........................................................................................23

        A.      The Court Should Deny Summary Judgment In
                Light of the Genuine Dispute as to Whether
                Any Trafficking Occurred ..........................................................23

        B.      The Government's Motion Relies Almost Entirely
                On Inadmissible Evidence..........................................................34

        C.      The Government's Statistical Evidence is
                Inadmissible Lay Opinion Evidence ..........................................35

D.   Plaintiffs' Evidence Creates Genuine Disputes
Of Material Fact That Must Be  Resolved At Trial..............................7

E.   Summary Judgment is Inappropriate in Light of the
Government's Failure to Identify the Customer(s)
Who Engaged in the Purportedly Suspicious Transactions ...............38

VII.   CONCLUSION................................................................................39

# <u>TABLE OF AUTHORITIES</u>

## <u>Federal Cases</u>

*Ashcroft v. Iqbal,*
    556 U.S. 662, 679 (2009)  .................................................2

*Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)  ...........................................37

*Brothers Food & Liquor, Inc. v. U.S.* 626 F.Supp.2d 875 (E.D. Ill.2009)..............19

*Donnelly v. Greenburgh Cent. School Dist. No. 7,*
    691 F.3d 134, 141 (2d Cir. 2012)  ...............................................37

*Fowler v. UPMC Shadyside,*
    578, F.3d 203, 210-211 (3d Cir. 2009)  .........................................2

*General Electric Co. v. Joiner*, 522 US 136, 147 (1997)  .......................................35

*Gross v. German Found. Indus. Initiative,*
    549 F.3d 605, 610 (3d Cir. 2008).  ...............................................2

*Han v. FNS*, 580 F. Supp. 1564 (D.N.J. 1984)  ...........................................38, 39

*Kolar v. Preferred Real Estate Investments, Inc.,*
    361 F. App'x 354, 359 n.5 (3d Cir. 2010)......................................3

*McTernan v. City of York,*
    564 F.3d 636, 646 (3d Cir. 2009)  ...............................................3

*Mell v. GNC Corp.*
    CIVA. 10-945, 2010 WL 4668966 at *4 (W.D. Pa. Nov. 9, 2010)  .............2

*Miller v. United States,* 54 F.R.D. 471(W.D.Pa. 1972)...........................................19

*Phillips v. County of Allegheny,*
    515 F.3d 224, 233 (3d Cir. 2008)  .................................................2

*Redmond v. U.S.*, 507 F.2d 1007 (5th Cir. 1975)................................................18, 20

*Roger Witmore's Auto Servs. v. Lake County, Ill,*
    424 F.3d 659, 667 (7th Cir. 2005)  .........................................23, 39

*Saunders v. US*, 507 F.2d 33 (6th Cir. 1974)................................................18, 19, 20

## Federal Statutes

7 U.S.C. § 2011-2023......................................................................................3

7 U.S.C. § 2021......................................................................................4, 8

7 U.S.C. § 2021(a)(2)..............................................................................3

7 U.S.C. § 2023................................................................................1, 7, 10

7 U.S.C. §2023(a)(13)..............................................................................2

7 U.S.C. §2023(a)(15)........................................................................23, 34

## Federal Rules

Fed. R. Civ. P. 12(b)(6)............................................................................2

Fed. R. Civ. P. 26(a)(2)...........................................................................35

Fed. R. Civ. P. 37(c)(1)...........................................................................35

Fed. R. Civ. P. 56(c).....................................................................23, 34, 39

Fed. R. Civ. P. 56(c)(2)...........................................................................34

Fed. R. Civ. P. 56(c)(4)...........................................................................34

Fed. R. Civ. P. 56(d)......................................................................10, 38, 40

## Federal Regulations

7 C.F.R. § 271-285....................................................................................4

7 C.F.R. § 271.2.......................................................................................4

7 C.F.R. § 278.1.......................................................................................5

7 C.F.R. § 278.2.................................................................................5, 9, 27

7 C.F.R. § 278.2(b)..................................................................................6

7 C.F.R. § 278.2(f)...................................................................................6

7 C.F.R. § 278.6.................................................................................5, 6, 8

7 C.F.R. § 278.6(b)(1)..............................................................................6

7 C.F.R. § 278.6(e)(4)(ii)..........................................................................6

7 C.F.R. § 279.5(a)...........................................................................................7

7 C.F.R. § 279.7 ..............................................................................................7

## **Other**:

Fiscal Year 2017 At a Glance Undercover Retailer Investigations........................16

*Gloesis Group vs. Retailer Operations Division* ................................................20, 21

*Howard's Quik Mart vs. Retailer Operations Division*..........................................22

2016 Foods Typically Purchased by SNAP Households...................................25, 26

Roach, Kent, Wrongful Convictions:  Adversarial and
        Inquisitorial Themes (June 1, 2010)............................................................32

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BETESFA, INC.,** a District of Columbia Corp**. d/b/a ABG MART**, and **BETELHEM KEBEDE GESESSE,** an Individual, | **CIVIL ACTION NO.  18-394 (RDM)** |

Plaintiffs,

v.

**UNITED STATES OF AMERICA**,

Defendant.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS OR,
IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

Plaintiffs, Betesfa, Inc., a District of Columbia Corporation d/b/a ABG Mart, and Betelhem Kebede Gesesse, an Individual, by and through their undersigned counsel, hereby respectfully submit this Memorandum in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss Plaintiffs' Complaint or, in the Alternative for Summary Judgment.

I.   **INTRODUCTION**

A.   **CASE HISTORY**

This matter originates from the Plaintiffs' participation in the Supplemental Nutrition Assistance Program (SNAP) as an authorized retailer.  (A.R. 1-10).  As the Government correctly notes, Betesfa, Inc., a District of Columbia Corporation d/b/a ABG Mart was permanently disqualified from participation in the SNAP program as the result of an issuance of the Charge Letter dated July 17, 2017 (A.R. 101-111), and an eventual Final Agency Decision (A.R. 194-207).  The Plaintiffs filed this action as a request for Judicial Review pursuant to 7 U.S.C. §2023 on February 21, 2018.  In pertinent part, 7 U.S.C. §2023 grants subject matter jurisdiction to the

Court to conduct judicial reviews of administrative disqualifications from SNAP, albeit with a requirement that said judicial review should be filed within thirty (30) days of the date of the final agency decision. (§2023(a)(13)).

The Complaint was timely filed (Document 1).  The Government subsequently filed its Motion to Dismiss Plaintiffs' Complaint or, in the Alternative for Summary Judgment (Document 10).  This memorandum is made in opposition thereto.

### B.   STANDARDS FOR A MOTION TO DISMISS

When reviewing a motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept the truth of all factual allegations and must draw all reasonable inferences in favor of the non-movant."  *Gross v. German Found. Indus. Initiative*, 549 F.3d 605, 610 (3d Cir. 2008).  Fed. R. Civ. P. 8(a)(2) requires only that the pleader "state a short and plain statement showing that the pleader is entitled to relief" so as to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests."  *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 500 U.S. 544, 555 (2007)).

In deciding a motion to dismiss for failure to state a claim, "[f]irst, the factual and legal elements of a claim should be separated.  Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Fowler v. UPMC Shadyside*, 578, F.3d 203, 210-211 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  "A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.  The Supreme Court's formulation of the pleading standard in *Twombly* does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element."  *Mell v. GNC Corp*.

2

CIV.A. 10-945, 2010 WL 4668966 at *4 (W.D. Pa. Nov. 9, 2010) (citing *McTernan v. City of York*, 564 F.3d 636, 646 (3d Cir. 2009)).  "So long as the complaint sets forth a 'plausible' claim to relief, [a] defendant's motion to dismiss must fail."  *Kolar v. Preferred Real Estate Investments, Inc.*, 361 F. App'x 354, 359 n.5 (3d Cir. 2010) (citation omitted).

For purposes of this section, the Motion to Dismiss should be denied.  The Plaintiffs have alleged sufficient allegations to show that their disqualification from the SNAP program was lacking in due process, and that their disqualification (and subsequent administrative review) was little more than an assembly line for automatic decisions.  If this case does not present a material issue as to whether or not Due Process exists, then it is difficult to envision a situation that would.

## II.   STATUTORY AND REGULATORY BACKGROUND

Originally part of the Food Stamp Act of 1964, the 7 U.S.C. §§2011-2023 was updated after the turn of the century by the Food and Nutrition Act of 2008.[1]  Due in part to the changes in technology (the replacement of paper stamps with electronic benefit cards, similar to debit cards), and in an effort to update the operation of the program as it pertained to participant benefits and sanctions to retailers who violate the program's regulations.  However, the core of the Food Stamp Act of 1964 has stayed largely in place.

Chapter 7 of the United States Code, section 2021 governs the disqualifications and sanctions of retailers who violate SNAP regulations.  In pertinent part, subsection (a)(2) of the statute permits the Defendant to promulgate regulations pertaining to the criteria for finding a store in violation of the SNAP regulations, and sanctions and penalties resulting therefrom.  Congress

---

[1] Portions of the laws were substantively updated in 1977 as well.  Since the 2008 update, the laws were tweaked in 2014, though not as substantively as they had been in 2008.

described the types of information that the Department would be permitted to utilize in its

evaluation of SNAP retailers:

> The Department may penalize a store "on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data,[2] or evidence obtained through a transaction report under an electronic benefit transfer system." (Footnote Added) (2014).

Under the authority granted to it by §2021, the Defendant created a series of regulations

that govern SNAP, including 7 C.F.R. §§271-285.  Of significance, §271.2 contains definitions of

pertinent terms:

> "Eligible foods means:   (1) Any food or food product intended for human consumption except alcoholic beverages, tobacco, and hot foods and hot food products prepared for immediate consumption and any deposit fee in excess of the amount of the State fee reimbursement (if any) required to purchase any food or food product contained in a returnable bottle, can, or other container, regardless of whether the fee is included in the shelf price posted for the food or food product; (2) Seeds and plants to grow foods for the personal consumption of eligible households; (3) Meals prepared and delivered by an authorized meal delivery service to households eligible to use coupons to purchase delivered meals; or meals served by an authorized communal dining facility for the elderly, for SSI households or both, to households eligible to use coupons for communal dining; (4) Meals prepared and served by a drug addict or alcoholic treatment and rehabilitation center to narcotic addicts or alcoholics and their children who live with them; (5) Meals prepared and served by a group living arrangement facility to residents who are blind or disabled as defined in paragraphs (2) through (11) of the definition of "Elderly or disabled member" contained in this section; (6) Meals prepared by and served by a shelter for battered women and children to its eligible residents; (7) In the case of certain eligible households living in areas of Alaska where access to food stores is extremely difficult and the households rely on hunting and fishing for subsistence, equipment for the purpose of procuring food for eligible households, including nets, lines, hooks, fishing rods, harpoons, knives, and other equipment necessary for subsistence hunting and fishing but not equipment for the purpose of transportation, clothing or shelter, nor firearms, ammunition or other explosives; (8) In the case of homeless SNAP households, meals prepared for and served by an authorized public or private nonprofit establishment (e.g. soup kitchen, temporary shelter), approved by an appropriate State or local agency, that feeds homeless persons; and (9) In the case of homeless SNAP households, meals prepared by a restaurant which contracts with an

---

[2] Notably, Congress did not authorize any particular formula or method regarding determination of "inconsistent redemption data," nor did it indicate what the standard measure should be. Presumably, this has been left to the discretion of the trier of fact.

appropriate State agency to serve meals to homeless persons at concessional (low or reduced) prices." (2016)

"Trafficking means:

(1) The buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone; (2) The exchange of firearms, ammunition, explosives, or controlled substances, as defined in section 802 of title 21, United States Code, for SNAP benefits; (3) Purchasing a product with SNAP benefits that has a container requiring a return deposit with the intent of obtaining cash by discarding the product and returning the container for the deposit amount, intentionally discarding the product, and intentionally returning the container for the deposit amount; (4) Purchasing a product with SNAP benefits with the intent of obtaining cash or consideration other than eligible food by reselling the product, and subsequently intentionally reselling the product purchased with SNAP benefits in exchange for cash or consideration other than eligible food; or (5) Intentionally purchasing products originally purchased with SNAP benefits in exchange for cash or consideration other than eligible food. (6) Attempting to buy, sell, steal, or otherwise affect an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signatures, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone." (2016)

Generally speaking, SNAP retailers participate in the program by selling Eligible food items to SNAP participants in exchange for the SNAP benefits (formerly food stamps).[3] These benefits are transacted through EBT terminals, which look like debit card machines. With respect to violations of the Retailer's responsibilities under SNAP, as well as the disqualification of retail food stores for said violations, 7 C.F.R. §278.6 contains all of the pertinent regulatory instruction.

In order to become a SNAP retailer, a store must apply to the Defendant (through the Food and Nutrition Service) and satisfy the requirements under 7 C.F.R. §278.1. After a SNAP retailer has been authorized, the Defendant tracks each and every SNAP transaction that occurs at the

---

[3] 7 C.F.R. §278.2

store, and stores the transactions into two databases: the ALERT System, and the STARS system. The ALERT System is responsible for determining the existence of potential SNAP violations (as discussed below). If a SNAP retailer conducts a certain type of transaction more than a particular amount of time, the ALERT System flags the retailer and the transaction data and forwards it to the Retail Operations Division of the Food and Nutrition Service (FNS) for further study and investigation.

SNAP violations come in four flavors: (1) discriminatory activity toward SNAP participants[4]; (2) the sale of ineligible items, either conspicuous[5] or minor[6] in nature; (3) the issuance of credit to SNAP households who then pay said credit balance using their SNAP Benefits[7]; and (4) trafficking in SNAP benefits, as defined above. Each category of violation, together with the retailer's past history and the circumstances of the violations, warrant different sanctions under §278.6. In the event the Defendant determines that a SNAP retailer has potentially violated the regulations under §278.6, the Food and Nutrition Service is to send a formal document containing the allegations called a "Charging Letter." The Charging Letter, written only in English, is sent via the United Parcel Service (UPS) in overnight mail, granting the respondent store a mere ten (10) days in which to respond to the allegations.[8]

The SNAP retailer responds to the allegations, often unrepresented and with the presence of severe language barriers, such as those that exist in this matter. The retailer is not provided with any information regarding the charges levied against them, other than a list of the transactions

---

[4] 7 C.F.R. §278.2(b)
[5] Things such as alcohol, tobacco, gasoline, etc.
[6] Also called "common non-food items" in the regulation; typically these include items used in preparation, storage or during consumption of eligible items, as well as small standard household items like paper products and first aid.
[7] 7 C.F.R. §278.2(f) and 7 C.F.R. §278.6(e)(4)(ii)
[8] See 7 C.F.R. §278.6(b)(1)

(each of which are referred to by the Charging Letter as a "violation").  The Defendant however, utilizes a number of resources in determining evidence against the retailer, including past undercover investigations, ALERT database statistics for surrounding areas, participant household identification and spending history, store evaluations, photos, and basic inventory evaluations.  The retailer is never presented with this evidence and is not provided an opportunity to rebut errors or inaccuracies which can frequently be found.

The Administrative Review Officer is to conduct an evaluation of the information upon which the initial determination was made, in addition to such further information as may have been submitted by the SNAP retailer.[9]  Again, there is no exchange of discovery or of information about how the prior decision was made when the appellant is preparing his/her appeal.  The Administrative review officer, however, has full access to the same resources utilized by the Defendant in the original decision, and then will often make arbitrary inferences and consider information (evidence) that is wholly outside the record, such as the validity of data and presumptions about the conclusions that may be reasonably relied upon.

After a decision is rendered by the Administrative Review Officer, the Plaintiff may seek a Judicial Review as permitted in 7 U.S.C. §2023 and 7 C.F.R. §279.7.  This review is *de novo* (as noted by both the statute and the rule), meaning the proceeding starts fresh with both sides being able to present evidence and arguments, subject to the rules of evidence and constitutional protections afforded in regular proceedings.  As such, the first time the SNAP retailer has the opportunity to actually confront and refute the allegations brought by the Department isn't until a Judicial Review when the Administrative Record is finally produced.  Furthermore, the Administrative Record is not automatically admissible, as has been postulated by the Government

---

[9] 7 C.F.R. §279.5(a)

in this instant case.  Therefore, a case such as this is not an average judicial review of an administrative determination as the Plaintiffs technically haven't been afforded Due Process in the first two (2) phases of the Defendant's action or an evidentiary process.

### III.   PROCEDURAL AND FACTUAL BACKGROUND

####    A.    PROCEDURAL BACKGROUND

The Plaintiffs run a small retail grocery store in Washington, DC specializing in serving the grocery needs of local residents.  Most of their customers purchase food through food stamps under the Supplemental Nutrition Assistance Program (SNAP).

The Defendant sent the Plaintiffs a Charging Letter dated July 17, 2017, pursuant to 7 U.S.C. §2021 and 7 C.F.R. §278.6, which alleged that the Plaintiffs were under investigation for trafficking in SNAP Benefits based upon transaction data.  (A.R. 101-111).  The Department cited two (2) categories of transactions they believed were trafficking, including (1) multiple transactions that were made from individual SNAP recipient accounts in short periods of time, and (2) transactions that were "excessively large."  *Id*.  The Defendant cited twenty-six (26) sets of transactions wherein multiple transactions were made from individual SNAP recipient accounts in what the Defendant viewed to be unusually short timeframes (A.R. 104-107) and one hundred eighty-six (186) transactions wherein the transactions were "excessively large" (A.R. 108-111).  There are no regulations setting forth how far apart such transactions need to be.  Instead, SNAP participants are permitted to make as many transactions as their benefits will permit, in as little or as much time as they so choose.

There is no regulation or provision within the SNAP rules that states what the pricing of food must be, or what a maximum transaction size should be.  In fact, the regulations make it clear that a SNAP retailer does not have the ability to turn away SNAP participants who are seeking to

purchase eligible items with their EBT card, regardless of size, type or volume.  See 7 C.F.R. §278.2.  Thus, the Retailers (and their transactions) are at the whim of the SNAP participant's selections.

The Plaintiffs responded timely to the Charging Letter, notifying the Defendant that there was not trafficking occurring at the store.  (A.R. 117).  The Plaintiffs specifically provided receipts and documentation which reflected the total EBT sales at the store in response to the Defendant's allegations of trafficking.  (A.R. 118-142)  (See Plaintiff's Affidavit attached hereto, hereinafter referred to as "Aff.")

On September 6, 2017, the Defendant acknowledged receipt of the Plaintiffs' responses, however they found that the Store had been engaged in trafficking, and permanently disqualified the Plaintiffs from SNAP.  (A.R.150-151).  On September 15, 2017, counsel for the Plaintiffs requested an Administrative Review, and were granted same on September 25, 2017 through the Administrative Review officer, Rich Proulx.  (A.R. 154; A.R. 157).

On January 2, 2018, the Plaintiffs, via counsel, provided a Memorandum of Law supporting their position that none of the Defendant's evidence suggested that any trafficking occurred.  (A.R. 162–191).  The memorandum provided supporting materials.  *Id.*

The Defendant summarily disregarded the Plaintiffs' representations and issued a Disqualification Letter on January 18, 2018 (received by the Plaintiffs on January 22, 2018).  (A.R. 194-211).  The Disqualification Letter was a form letter, merely notifying the Plaintiffs that their statements had been considered, but that FNS had determined that the store had been trafficking in SNAP benefits. *Id*.

After the unsuccessful Administrative Appeal, the Plaintiffs timely filed this Judicial Appeal on February 21, 2018, and served upon the Defendant, in which the Plaintiffs again argued

that the evidence indicated that the algorithm/computer program (or FNS) failed to adequately account for the business practices of the Plaintiffs, and that the Defendant relied solely on assumptions resulting from the data in its possession while summarily disregarding the plausible and likely explanations provided by the Plaintiffs.

As noted above, this is an action brought pursuant to 7 U.S.C. §2023 and is a *de novo* judicial appeal of the Defendant's administrative disqualification of the Plaintiffs from participating in the Supplemental Nutrition Assistance Program (formerly food stamps) ("SNAP").

**B.   CURRENT STATE OF DISCOVERY**

A Rule 56(d) affidavit is attached hereto.  Discovery is necessary in this matter for the reasons set forth therein, and hereunder, but has not occurred.

As the matter presently sits before the Court, the Defendant's assertions and circumstantial evidence have not been subject to meaningful cross examination by the Plaintiffs, and were only disclosed to the Plaintiffs at the outset of this Judicial Appeal.  Until this appeal, no pertinent or useful portion of the Case Analysis Document (CAD, located at A.R. 71 – 100) was disclosed to the Plaintiffs to permit them the opportunity to refute the allegations, inaccuracies and assumptions set forth therein.

With respect to these proceedings, discovery in this matter has yet to commence as a result of the Defendant's Motion to Dismiss, and because pursuant to Rule 26(d), no Rule 26(f) conference has occurred as a result of the Defendant's motion.  A meet and confer regarding the completeness of the Administrative Record was held, though as the undersigned noted in that meeting, the Plaintiffs have no reasonable way to evaluate the completeness of the A.R. as they were not part of its compilation, nor have they ever seen it until this appeal.

The Plaintiffs are in need to coordinate the depositions of an ALERT System Manager (Mr. Douglas Wilson), Mr. Jeffrey Sparman (the USDA analyst in this matter), and/or Mr. Fredrick Conn (the Section Chief who disqualified the Plaintiffs and reviewed the analyst's report), as well as potentially Mr. Richard Proulx (the USDA Administrative Review Officer).  The Plaintiffs have further need for the depositions of several SNAP Participants and the Retailer Investigative Branch agent who conducted an undercover investigation during the Review Period which found that the store *was not engaged in trafficking*.  Further discovery is anticipated after the Defendant's analyst identifies the stores he utilized for a baseline in the evidentiary evaluation as well as the names and addresses of the other SNAP participants listed in the charging letter and any experts the Defendant may ultimately offer.

The following categories of discovery will also be necessary for the Plaintiffs to successfully prepare their case: (1) Copies of all data and information in the Defendant's possession which were used by the Defendant, its Agencies, Division, and employees upon which the Charging Letter was based; (2) Copies of the entire SNAP retailer file, and all records for the Plaintiff as a SNAP retailer which are in the possession of the Defendant, to include but not be limited to: all investigations of the store that have ever been conducted; the application to use SNAP benefits; all pictures and other documents relied upon by the Defendant in issuing the Charging Letter; and all other information and records on file; (3) Copies of all EBT/SNAP transaction data for the Plaintiffs since the store began accepting SNAP benefits; (4) Copies of all EBT/SNAP transaction data for any and all stores to which the Plaintiff was compared to in the Defendant's Evaluation of the Charging Letter and the Plaintiff's response; (5) Copies of *all* Household data from January 2017–May 2017 for each of the households identified in the Charging Letter, to include but not be limited to purchase transaction history, contact information,

and such other information as may be appropriate and necessary; (6) Copies of any program, algorithm, or other such computation which was utilized in the creation of the attachments to the Charging Letter; (7) Copies of all Final Agency Decisions pertaining to SNAP retailers that have been disqualified, fined with Civil Money Penalty, or suspended from participating in SNAP from November 11th, 2015 to the date of compliance with the Request to Produce; and (8) A complete copy of all documents and other information considered by the Defendant in its permanent disqualification of the Plaintiffs, and in the subsequent administrative appeal, including but not limited to all correspondence, reports, records, memorandums and the like.

Of specific interest to the Plaintiffs is the data sorted and compiled by the ALERT system, and the validity of the Defendant's interpretation of said data.  As noted throughout the CAD, the Plaintiffs were set against other stores with respect to their ALERT standings and positions, making the ALERT patterns and data the cru of the Defendant's decision to this point.

With no discovery having been conducted, it's hard to imagine how the Plaintiffs could reasonably be expected to compile and submit evidence.

**C.     UNDISPUTED FACTS.**

The Plaintiffs have set out separately a list of undisputed facts, which are incorporated herein by reference.  The Defendant, for whatever reason, has chosen not to prepare a set of undisputed facts for the Plaintiffs to specifically respond to.  Accordingly, to the extent the Defendant has made such representations in its brief, the Plaintiffs refute such statements to the extent they do not appear in the Plaintiffs' specifically set out list.

**D.     DISPUTED FACTS**

More specifically than the general refutation set out above, the Plaintiffs dispute the Defendant's representations as follows: (1) the patterns sought by the ALERT system (and alleged

by the Defendant to be evidence of trafficking) are not based upon empirical data, case studies, or any other accepted form of data modeling or analysis that would create a statistically significant correlation to trafficking; (2) the Defendant's evaluation of transactions is based upon wrote assumptions that are refuted by the Defendant's own statistical studies; (3) that the Plaintiffs have maintained and sold sufficient inventory to support the alleged transactions; (4) that transactions were not made from individual accounts in inappropriately short time frames; (5) that transaction sizes are largely the result of the store's inventory, a circumstance not commonly found in other stores in Washington, DC to which the Plaintiffs were compared, materially effecting the Department's evaluation; and (6) that trafficking did not occur.  Furthermore, the transaction timing as set out in the Exhibits to the Charge Letter cannot be accurate, and thus should be disregarded.

The Plaintiffs have not had sufficient opportunity to discover all of the evidence that is anticipated in this matter as a result of the parties not coordinating the depositions of the aforementioned witnesses prior to the filing of the Defendant's motion to dismiss or for summary judgment.

IV.    STATEMENT OF FACTS: ALERT SYSTEM

The Defendant's case is entirely predicated on the validity and admissibility of the circumstantial evidence derived from the statistical analysis conducted by the Defendant, and predicated *solely* on the ALERT System.  A.R. 71-100.  In the absence of these transaction patterns cited by the Department, there is no evidence in the record indicating the presence of trafficking in this matter.

Accordingly, the undersigned counsel has conducted a deposition of Mr. Douglas Wilson, who is the ALERT System Administrator previously identified by the Government (in another

case) as the most knowledgeable employee about the operation and foundation of the ALERT system.  This deposition in its entirety is attached hereto as **Exhibit A**, but notably, was not noticed for the above referenced action (as discovery in this matter has not yet begun).

The ALERT System has been in existence in its current form since the late 1990's.[10]  The program is designed to detect and identify fraud within the EBT system[11], though the Department acknowledges that it cannot actually identify fraud on its own,[12] nor does the system have the ability to determine what "normal" transactions should be.[13]  Furthermore, the ALERT System lacks the ability to distinguish different types of violations,[14] and doesn't account for atypical shopping patterns of individual participants[15] or how many people are shopping together in one transaction.[16]

With respect to the threshold amounts and frequency, these amounts and occurrences have been the same since the inception of the program in the 1990's.[17]  That means that if a pattern is looking for a particular dollar amount (such as "large transactions"), the System has not adjusted for inflation since at least 1999.  In that same period of time, according to the United States Department of Labor, Bureau of Labor Statistics, inflation has increased $.46 on the dollar.[18]  So, if a qualified purchase in 1999 cost $20.00, and was below the threshold amount of $24.00 in the

---

[10] The program's origins in the 1990's, see Wilson Deposition Transcript, Page 21 starting on line 11.

[11] Wilson Transcript, Page 21 starting on line 9.

[12] Wilson Transcript, Page 25 Line 16.

[13] Wilson Transcript, Page 60 Lines 1-3.

[14] Wilson Transcript, Page 65 Lines 14-19.

[15] Wilson Transcript, Page 70 Lines 14-21.

[16] Wilson Transcript, Page 71 Lines 3-5.

[17] Wilson Transcript, Page 27 Lines 4-17.  Mr. Wilson indicated that he was certain the thresholds had not changed since at least 2006, but was of the belief that they haven't changed since the 1990's.

[18] The Plaintiff would ask that this Court take Judicial Notice of the Consumer Price Index and the records maintained by the Bureau of Labor Statistics for purposes of evaluating this amount.

ALERT System, the very same transaction in 2016 would cost $29.20 and rise above the threshold – earning it the status of "suspicious transaction" despite the fact that none of the details of the transactions had actually changed.

Though the Defendant waffles between saying that the transactions are indicative of fraud or just merely "unusual",[19] Mr. Wilson states, "[t]he fact that we look at these analyses and look for these patterns does not indicate that the retailer is committing fraud.  This is one factor that the [analyst] uses along with other factors to make a determination."[20]  Other factors include: where is the store located; whether there are other retailers in the immediate geographic area; what inventory the store maintains; and past complaints.[21]  Why these factors are significant is not clear from Mr. Wilson's Deposition, and would need to be asked of the Defendant's analyst.

Furthermore, the report I have attached hereto (**Exhibit B**) contains both empirical data (on-site undercover investigations conducted by the Retailer Investigation Branch looking for SNAP violations in retailer's stores) and ALERT charging data (page 8).  Presumably, a data driven system, such as ALERT, should demonstrate a proportionate return on results within the margin of error of actual empirical evidence in order to be considered accurate – especially where the Defendant specifically cites under-cover investigations as the origin of the patterns that test for trafficking.  A.R. 205.   The existence of this proportionality was something that Mr. Wilson indicated should exist:

> "Q:     …If [ALERT] is going to be looking for patterns, you would have to have an original pile of data… to derive those patterns from when comparing them to new data coming in when you're looking for functionally the same symptoms.  Is that correct?
> A:      Correct." (Wilson Transcript Page 26, Lines 4 – 12)

---

[19] Wilson Transcript, Page 56 Lines 12-15, Page 58 Line 5.
[20] Wilson Transcript, Page 50 Lines 12-16
[21] Wilson Transcript, Pages 53 and 54, Generally.

However, the *Fiscal Year 2017 At A Glance*[22] Undercover Retailer Investigations data shows the opposite: at least 1,348[23] stores were disqualified for trafficking in SNAP benefits using the data analysis process, or approximately 49.14% of the stores identified by the ALERT system.[24]  Conversely, the empirical data (the actual Undercover Retailer Investigations) shows that only 13.89% of the stores identified by ALERT actually have trafficking.[25]  This means that the data-analysis cases are resulting in findings of trafficking at a rate far higher than the actual data supports.

To make matters more complicated, the Defendant will occasionally charge and convict a store with trafficking even though an undercover investigation has returned negative results during the Review Period, which calls into question the foundation of the ALERT system itself, as the six (6) patterns were (allegedly) based upon the experience of undercover investigators.[26]  **This case is one such case where a concurrent RIB undercover investigation looking for trafficking resulted in an "absence of indications that the subject store violates program regulations."**  If the under-cover investigators don't find trafficking, and the system is built upon said investigator's experience, the two should presumably line up.

---

[22] See Exhibit B

[23] 1,661 stores were permanently disqualified for trafficking; 313 of those disqualifications were the result of undercover retailer investigations; 1,348 were disqualified, presumably, through data analysis and the process involved in this case.

[24] Page 1 of the *Fiscal Year at a Glance* document, lists 8,300 investigations of retailers.  Page 8 indicates that 5,557 of these investigations were Undercover Retailer Investigations, leaving 2,743 investigations conducted using the data analysis process involved in this case.  $1,348 \div 2,743 = 49.14\%$

[25] There were 3,606 undercover investigations conducted in 2016, 288 had positive results of trafficking, or 7.98%.

[26] This information is proffered but within the experience of the undersigned counsel.

Therefore, the proposed data analysis by the Defendant, namely that trafficking existed in this case, is not supported by competent and substantial evidence, and is in any case an issue of material fact that needs to be determined by the Court.

**A.**    **STATEMENTS OF FACT: THE PLAINTIFFS' BUSINESS**

The Plaintiffs have attached hereto an affidavit reaffirming that the statements and evidence offered by them that is contained in the Administrative Records are true and accurate to the best of their knowledge (**Exhibit C**).  However, as discovery continues to proceed in this matter, the Plaintiffs seek to demonstrate that their inventory flow, pricing and business model were not contemplated by the ALERT data or the analyst, and that considerable oversights were made by the Department.

Furthermore, the Plaintiff will seek to demonstrate (through testimony of the store's owner, clerks and yet-to-be-identified SNAP participants) that regular SNAP transactions at the store involved a considerable amount of the higher priced items, or a larger volume of the moderately priced items (like packs of soda).

Evidence currently in the Administrative Record (largely derived from the Brief in Support of the Appellant's Request for Review of Permanent Disqualification and signed by the undersigned counsel) includes: (1) receipts from a substantial portion of the transactions set out in the Charge Letter; (2) cash and debit receipts showing similar sized purchases being made using other forms of payment; and (3) a 2016 tax return showing net revenue and cost of goods sold. Addition evidence submitted herewith: (1) some invoices from vendors (additional invoices are anticipated once subpoenas become available in this matter) (**Exhibit D**); and (2) affidavits from SNAP participants who shopped at the store and attest to the items that they purchase (**Exhibit E**).

Furthermore, once identified, the SNAP participants cited by the Defendant are expected to be called to testify about the nature of the transactions, to include detailed accounts of foods and quantities purchased by them at the Plaintiffs' store.

The Plaintiff's Affidavit in support provides support for their position and demonstrates the existence of a material fact under genuine dispute - the Plaintiffs can adequately account for the transactions the Defendant claims are indicative of trafficking.  The detailed explanations set forth in Paragraph 22 of the Affidavit answers the two (2) categories of transactions.

## V.   AUTHORITIES PERTINENT TO THIS MOTION

### 1)   Review of Administrative Decisions in SNAP Cases

As mentioned throughout this response, a District court's role in these proceedings is to conduct a *de novo* evaluation of the facts underlying the parties' positions and to come to a decision, on its own, as to whether or not the Plaintiffs have established their case that it is more likely than not that trafficking did not occur at the store.  See *Redmond vs. U.S.*, 507 F.2d 1007 (5th Cir. 1975), rehearing denied 510 F.2d 384.  "By rejecting the substantial evidence standard of review [from the Administrative Procedures Act] in the Food Stamp Program and permitting a trial de novo, Congress intended nothing more than that the district court would not be bound by the administrative record."  *Id.* at 1011.  See also *Saunders vs. US*, 507 F.2d 33 (6th Cir. 1974) holding that the statute "requires a reexamination of the entire matter rather than a mere determination of whether the administrative findings are supported by substantial evidence."  *Id.* at 36.  The Circuit Court continued, explaining that "the court should make its own findings of fact based on the preponderance of the evidence and not limit itself to matters considered in the administrative proceedings."  *Id.*

With respect to the admissibility of the contents of the administrative record, the Court in *Saunders* held that "even if the unsworn statements relied upon by the government were sufficient to support a determination at the administrative level, the provision for a trial *de novo* requires that the district court make its determination on evidence of a kind and quantity sufficient to support findings of fact." *Id.*

### 2) On-Point Case Law Pertaining to Early Motions for Summary Judgment

It is the routine practice of some USDA regional counsels to push for a Motion for Summary Judgment to be filed by the U.S. Attorney's office, as though this were a basic judicial appeal of an administrative record, and not a *de novo* case that is more broad in scope than the limited corners of the A.R. Accordingly, other districts have previously addressed whether or not a Motion for Summary Judgment is appropriate, and routinely found that it is not.

In the SNAP Violation case, *Brothers Food & Liquor, Inc., vs. U.S.*, 626 F.Supp.2d 875 (E.D. Ill. 2009), the District Court held that where a plaintiff presents some justifiable inferences which call into question whether it actually engaged in food stamp trafficking, the Government is not entitled to a judgment as a matter of law.

Likewise, *Saunders,* mentioned above, concurs with the approach of the court in *Brothers*.

> "Since the procedures followed at the administrative level do not provide for discovery or testing the evidence of the Department of Agriculture by cross-examination, it is particularly important that an aggrieved person who seeks judicial review in a trial de novo not be deprived of these traditional tools unless it is clear that no issue of fact exists. As the court pointed out in *Miller v. United States*, 54 F.R.D. 471 (W.D. Pa. 1972), all doubts as to the presence of a genuine issue of material fact should be resolved against a party moving for summary judgment. The unsworn denials of appellant through his counsel raised sufficient doubts about the facts set forth in the unsworn statements which were the basis of the administrative determination of disqualification to preclude summary judgment at this stage of the proceedings." *Id.*

3)    **Regulatory and Case Law Guidance**

As mentioned throughout this response, a District court's role in these proceedings is to conduct a *de novo* evaluation of the facts underlying the parties' positions and to come to a decision, on its own, as to whether or not the Plaintiffs have established their case that it is more likely than not that trafficking did not occur at the store.  See *Redmond vs. U.S.*, 507 F.2d 1007 (5th Cir. 1975), rehearing denied 510 F.2d 384.  "By rejecting the substantial evidence standard of review [from the Administrative Procedures Act] in the Food Stamp Program and permitting a trial de novo, Congress intended nothing more than that the district court would not be bound by the administrative record."  *Id* at 1011.  See also *Saunders vs. US*, 507 F.2d 33 (6th Cir. 1974) holding that the statute "requires a reexamination of the entire matter rather than a mere determination of whether the administrative findings are supported by substantial evidence."  *Id* at 36.  The Circuit Court continued, "the court should make its own findings of fact based on the preponderance of the evidence and not limit itself to matters considered in the administrative proceedings."  *Id*.

The question then becomes one of how high the bar of "preponderance of the evidence" should be set.  The Department itself has outlined instances where it believes sufficient evidence has been offered to account for the transaction patterns that a finding of trafficking should be overturned:

- *Gloesis Group vs. Retailer Operations Division*:  This case is attached hereto as **Exhibit F** and neither Westlaw nor Lexis record these decisions, though they are published by the Agency itself.  In this case, a retailer was charged with trafficking based upon a series of irregular SNAP transaction patterns that occurred during a six-month period between September of 2015 and February of 2016.  *Id* at 1.  There were

three transaction categories in that case: transactions made from individual benefit accounts in unusually short time frames; excessive number of manual key entered EBT transactions; and excessively large purchase transactions. *Id* at 3. The retailer replied that it sold expensive food items, including fish, and that many of his customers are refugees coming from another country. *Id* at 4. Furthermore, the SNAP customers at the retailer's store make purchases in a matter of a few minutes as a result of additional needs after an initial purchase, and they have a propensity to purchase food in bulk because of infrequent visits to the store. *Id*. In support, the retailer submitted 27 pages of inventory invoices and a 2015 sales tax return. *Id*. In *Gloesis*, the store was only 1,000 sq. feet in size, with only some hand baskets but no shopping carts, a specialty inventory (African ethnic food), no optical scanner, bulk bags of rice and grain. *Id* at 5. The Administrative Review Officer determined that the prices contained in the Scan B2 category could be satisfied by the purchase prices of the items in the store, and accepted the store's explanation that customers routinely return for supplemental shopping trips. *Id* at 5. Despite having a state store average purchase transaction of $11.34, the Administrative Review Office found that the price of items in the store satisfied the large purchase transactions. *Id* at 6. Ultimately, the Administrative Review Office overturned the disqualification: "in summary, the explanations as provided by ownership regarding the record of transaction data at Appellant are plausible and supported by documentation submitted for review. *Moreover, a finding of trafficking that is based not on investigative evidence, but rather on SNAP EBT data analysis alone, must be grounded on the disclosure of transaction characteristics for which there is no better explanation other than trafficking. While it is impossible to*

*conclude that trafficking positively did not occur, the preponderance of evidence does not support the conclusion that trafficking is the most probable explanation for the questionable transactions*." *Id*. (Emphasis Added)

- *Howard's Quik Mart vs. Retailer Operations Division*.:  This case is attached to hereto as **Exhibit G.**  In this case, the Administrative Review Division overturned a permanent disqualification based upon trafficking allegations stemming from irregular transaction patterns including both Scan B2 (short-time transactions) and Scan F (excessively large transactions).  *Id* at 1.  In this matter, as with this matter, the Department had selected a six-month review period and a number of transactions to support each pattern.  *Id* at 2.  The retailer responded to the charges, denying that trafficking had occurred, although the retailer did not submit an initial response to the Charge Letter, but instead responded only during the Administrative Review process.  *Id* at 5.  The retailer provided 11 cash register receipts showing SNAP sales from one month of the review period.  *Id*.  Each receipt showed a large purchase of cola and food.  *Id*.  The retailer also submitted sales tax documentation from the review period showing that the store's eligible item sales exceeded the SNAP transactions.  *Id*.  In the written opinion the Administrative Review Officer determined that while the evidence was meager in comparison to the number of transactions set forth in the charge letter, the evidence was credible and compelling.  *Id* at 6.  Specifically, the Administrative Review Officer cited that the 11 receipts showed purchases that demonstrated the purchasing habits that the retailer specifically stated occurred at the store.  *Id*.  The Review Officer specifically noted that "it is impossible for this review to definitively conclude that trafficking did not occur at the Appellant firm at any point during the review period;

nor would it be possible to do so in a case based on inconsistent redemption data. However, the determination of permanent disqualification must be supported to such a degree as to conclude that trafficking is the only plausible explanation." *Id*.

### 4)      Summary Judgment Standards

Generally speaking, Summary Judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movement is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact, and judgment as a matter of law should be granted in their favor.  *Id*.   Once the moving party has met the initial burden, the non-moving party must offer more than a mere scintilla of evidence to survive summary judgment.  See *Roger Witmore's Auto Servs. v. Lake County, Ill,* 424 F.3d 659, 667 (7th Cir. 2005).  In the instant action, the Defendant's failed to provide any statement of facts with references to the administrative record, or provide a statement of material facts for which they contend that there is no genuine dispute.

In ruling on a motion for summary judgment, only admissible testimony having probative force is to be considered.  As in general, summary judgment testimony that simply reflects legal conclusions is inadmissible.  Thus, for example, the Defendant's motion reflects that there are no genuine issues of material fact and thus is an inadmissible legal conclusion.

## VI.   ARGUMENT

### A.      The Court Should Deny Summary Judgment in Light of the Genuine Dispute as to Whether any Trafficking Occurred

Plaintiffs are entitled to *de novo* review, See 7 U.S.C. § 2023(a)(15).   Unlike other administrative challenges under the Administrative Procedures Act, the Court is not strictly held to a review the sufficiency of the administrative decision, but instead, must "reach its own factual

and legal conclusions." *Id.* The issue before this Court is not whether FNS "fully considered" the Plaintiffs' evidence, or whether the Defendant merely made "an error," or even whether the Defendant acted with evidentiary support when it "ultimately rejected" the Plaintiffs' evidence in favor of its own preferred conclusions. Rather, the Court must ultimately decide if trafficking actually occurred.

The evidence presented herein by the Plaintiffs acts to do two things: (1) prove that the transactions in question have another, more likely explanation than trafficking; and (2) to demonstrate that the evidence relied upon by the Defendant, which has not yet been subject to cross examination, testing or attack, is inadmissible and/or insufficient to establish the Defendant's contentions.

To be clear, the Plaintiffs' evidentiary basis is incomplete at this point – with no discovery, the Plaintiffs don't know who the households are that conducted the transactions, and haven't had an opportunity to cross examine the Defendant's agents to more accurately bring to light the discrepancies found in both the Case Analysis Document and the Final Agency Decision. Nevertheless, as the evidence sits now (largely limited to the administrative record), the following is a summary of the evidence in support of the Plaintiffs' contention.

**Multiple Transactions in Short Times:** To begin with, only three (3) matrices of the transactions set forth in Attachment A to the Charge Letter appear to have been run at the times that are reported by the ALERT system. A.R. 104 – 107. For example, the first set of transactions are listed as having *both* occurred at precisely 11:29 a.m. That's impossible to have actually run at the same time – even had the Plaintiffs attempted to run the transaction at the same time. By definition, the machine would have needed to clear the first transaction, then process the second transaction. Instead, it appears that all of these transaction times were grouped by computers

(nearly all of them occurring on the minute precisely), and do not reflect the actual time that the transaction was run, but rather how the computers recorded the transaction later.  Under the circumstances (where the Department has alleged that the timing of the Plaintiff's transactions are suspicious), the Government's evidence is patently unreliable as the Plaintiffs physically lack the ability to freeze time long enough to make those transactions occur precisely as they are set out. Discovery is necessary to determine how these transactions were recorded as such, as the Plaintiffs do not (and cannot) time the transactions as they are set out in the attachment.

Outside of the specific timing problems inherent in the transaction log, the Plaintiffs noted in their brief that many of the "close in time" transactions occur as the result of co-shopping, which is where two or more adults in a household will make separate purchases (using the same account) as a result of either logistics, or budgeting purposes.  A.R. 172.  Under these circumstances, the household appears to make repeat purchases in short periods of time, but the individual responsible for the purchase is different than the individual who made the initial purchase.  *Id*.  As that works out in the store, these transactions are made either with the presence of multiple household members in the same store at the same time (where they make their selections and present them for purchase consecutively – resulting in transactions that occur within the same twenty-minute period of time), or where different household members visit the store at different times (separated by hours typically) and pickup different household needs.  *Id*.  The second method is preferred by many households to minimize negotiation on the items purchased, which in turn results in higher purchase transaction amounts.  *Id*

Also, participants return to the store regularly because the store is open twenty-four hours a day and stocks nearly all of the top thirty (30) most commonly purchased commodities that SNAP participants buy, according to the Department's 2016 *Foods Typically Purchased by SNAP*

*Households* study, attached hereto as **Exhibit H** (page 18).  These items include (items are labelled by their rank according to the report – items the store does not carry are excluded):

1)  Soft Drinks
2)  Fluid Milk Products
3)  Beef Grinds (Jerky)
4)  Bag Snacks (chips, pretzels, etc.)
5)  Cheese
6)  Baked breads (sandwich breads)
7)  Cold Cereal
9)  Frozen handhelds and snacks
10) Lunchmeat
11) Candy- packaged
12) Infant Formula
13) Frozen Pizza
14) Refrigerated juices/drinks
15) Ice Cream, Ice Milk, Sherberts,
16) Coffee and Creamers
17) Cookies
18) Water
19) Shelf Stable juice
20) Eggs, muffins
21) Frozen single serving premium meals
23) Bacon
26) Sandwich Spreads
28) Frozen Prepared Chicken

Furthermore, the number one item that participants purchase is soft drinks, which as the Defendant notes in its *Foods Typically Purchased by SNAP Households* study, participants usually buy sodas in bulk, preferring to buy 12/18 & 15 can packs, 2 liters, and 20/24 packs the most.  *Id* at Page 34.  Accordingly, the store carries in significant bulk to biggest and most common purchase that participants make.

Other logistics that contribute to the short-in-time include the fact that the store has two cash registers for grocery purchases but only one EBT point of sale device. A.R. 50.  If both registers were to conduct transactions for a co-shopping household separately, and then run the transaction through the single EBT machine, the transactions would occur quickly in time, but not actually reflect the amount of time it took to actually conduct the transactions as they were occurring simultaneously.  The Plaintiffs believe this to have occurred in the transactions set forth in the Charge Letter, as such transactions have occurred in the regular course of business in their experience, but again, without knowing the identity of the households it's nearly impossible to determine if each of these transactions was the result of this.

Finally, with respect to logistics, the Store does not need to pass every item through the barrier.  (See Plaintiff's affidavit, **Exhibit C**)  If the clerk so chooses, he/she may identify items by sight and enter a price on the machine in a generic "Quicksale" category, sometimes rounding the amount to a whole dollar in order to expedite the transaction.  See A.R. 118-127.  Othertimes, where the clerk knows what the item's price is and can merely enter it (again, sometimes with an even number of cents where the items is already rounded by the store).  This process is utilized where there are a large number of items or customers in the store, and results in even numbered cents at the end of the transaction.  See Plaintiff's Affidavit.

In summary, given that the store's inventory includes many of the most commonly purchased items, the store is conveniently located near where the SNAP participants live (presumably), and that SNAP participants commonly like to co-shop, it's not unreasonable to expect the participants to return in short periods of time to make additional purchases.   Now, without the benefit of discovery, the Plaintiffs cannot submit deposition testimony of the households who actually conducted the transactions to the Court for review which would further support the Plaintiffs' contentions.

**<u>Excessively Large Purchase Transactions</u>**

To begin with, as noted above but worth mentioning again, the store does not have the ability to decline a SNAP transaction unless (1) it is for ineligible items or (2) they wouldn't typically accept the transaction even if it were a cash transaction instead of an EBT transaction.  See 7 C.F.R. §278.2.  This means that if a SNAP participant wants to buy $200 worth of soda (the most common item the households purchase, which they also purchase in bulk), the store literally doesn't have the ability to decline the sale – regardless of the fact that the Department will subsequently view the sale as "suspicious."

Under these circumstances, the question for the Court to determine is whether or not (1) the store had sufficient inventory to satisfy the transactions; and (2) are the purchase transactions likely to occur.  In this matter, we have the benefit of some of the transaction receipts (A.R. 118 – 127) which show purchases of $60.01, $44.13 (A.R. 123), $102.40, $41.61 (A.R. 122), $102.00, $41.77 (A.R. 121), $161.00, $117.63, $123.00 (A.R. 131) to name a few.  As noted above, many of the round dollar transactions are the result of a timing issue or clerk preference, but many of these transactions appear to be for purchases of bulk soda, frozen prepared meals, frozen prepared chicken and other smaller items bought sometimes three (3) to nine (9) at a time.  The participants transport these items either through their own conveyance (with the assistance of bags) or with the assistance of friends/other household members who show up to co-shop or assist.  See Plaintiff's Affidavit in support.

The store's inventory, just using the Department's records, clearly shows that there's far more than $200.00 in the store at any given point in time.  The photographs taken by the on-site inspector (A.R. 56 – 70) show thousands of dollars of eligible food items on the shelves and in the coolers.  The Plaintiffs' tax return from 2016 (and the newer 2017 tax return which is submitted herewith as **Exhibit I**) shows at least $15,768 worth of inventory on the shelves as of December 31st, 2016, and $20,137.00 as of December 31st, 2017.  The 2017 Sales Tax returns (attached hereto as **Exhibit J**) show the store selling more than 80% of its revenue as food items, (roughly $14,750.00 per month, which show up as non-taxable).  Considering that amount of the store's sales being eligible items, the Plaintiffs reported $378,367.00 worth of inventory purchases in 2017 – or $302.693.60 (at cost) of food inventory.  See 2017 Form 1120S attached hereto.  This means an average amount of $25,224.00 of food is purchased by the store and moves through its inventory – being purchased by the participants and carried out.  Certainly, this volume of food can more

than sufficiently satisfy the highest purchase (which includes an average 35% net revenue margin) of $182.49.  A.R. 108.  Therefore, the quantity of the inventory is satisfactory account for the transactions.

The likelihood of the SNAP households making these purchases is dependent upon two issues: (1) the store carrying inventory items that the SNAP participants want and (2) the SNAP participants preferring to shop at the Plaintiff's store.  As mentioned above, the store carries nearly all of the most commonly purchased items that SNAP households purchase, including at least 9 of the top 10 items, and 24 of the top 30 (as well as a substantial portion of the remaining top 100).  Accordingly, the store has what the SNAP households like to purchase so it is not unreasonable for the participants to buy these items from the Plaintiffs' store.

The size of the transactions are also dependent upon price of the items, which the Defendant had an incomplete picture of.  The Defendant's on-site inspector missed the most expensive items in the store, failing to list infant formula ($24.99), chicken wings ($25.99), prepared chicken tenders ($30.00), and frozen burgers ($25.00).  See Plaintiff's Affidavit compared to A.R. 50.  There are pictures of these items throughout the on-site inspection photographs located between A.R. 56 – 70, including images of the infant formula, burgers, and chicken.

But this is the place where the Defendant's analysis in this area is disconcerting.  The Defendant time and time again indicates a concern that the store doesn't carry sufficient "staple foods" to account for the transactions.  See A.R. 76, 86, and 90 in the Case Analysis Document, and A.R. 204 in the Administrative Review.  Furthermore, the Defendant summarily dismisses the idea that SNAP participants are purchasing infant formula, instead reasoning that SNAP participants would buy formula with WIC benefits rather than SNAP benefits.  *Id* at 204.  However,

as previously noted in the Defendant's *Foods Typically Purchased by SNAP Households* study, infant formula is #12 on the top 100 items purchased list.  *Id* at 19.

The Defendant made a series of wrote assumptions about what the SNAP participants wanted to buy (citing the absence of "staple foods" routinely to justify their position that the transaction sizes were inappropriate), and eliminated the likelihood that the participants weren't interested in purchasing the items the Defendant thought they were.  Furthermore, the Defendant makes assumptions about the inventories of other stores to which it compares the Plaintiffs, but such assumptions are not supported by the A.R.  See A.R. 86 to 92.  This is discussed in greater detail below.

The second part of this analysis being the SNAP participants' desire to shop at the Plaintiff's store as opposed to some of the other stores available nearby.  There is no evidence in the record whatsoever that speaks to the preferences of the SNAP participants, except for the Plaintiff's Affidavit in support of this memorandum, which notes that the Plaintiffs seek to improve their customer's experiences by providing the items that the customers wish to purchase, and by generating word-of-mouth business from their good customer service.  See Plaintiff's Affidavit paragraphs 15 to 18.  In the absence of testimony from the households, anything more about the SNAP participant's preferences is hearsay and inadmissible.

In conclusion, the presence of sufficient inventory is indisputable – the photographs from the on-site inspection and the Plaintiff's tax records support this.  The receipts show that the purchases are typically comprised of a number of medium priced items, most of which are transported by the participants and family members/friends who come with them to the store.  The inventory selection supports the notion that the participants would be seeking to purchase the items contained within the inventory (and pictured on the shelves and in the coolers) according to the

Defendant's own study.  Without an inventory analysis of the comparison stores in the record, its impossible for the Defendant to draw a meaningful distinction between the Plaintiffs' store and the comparison stores because the comparison stores are a complete mystery for evidentiary purposes.  Furthermore, without discovery, there is no evidence pertaining to the SNAP household's preferences except the Defendant's study (which supports the Plaintiffs' contentions) and the Plaintiff's affidavit in support.  Therefore, there is sufficient evidence to indicate that these transactions are more likely to be the result of SNAP participants purchasing habits at the subject store than the presence of trafficking;

### RIB Investigation

The most significant piece of direct evidence was completely disregarded by the Defendant: namely the Retailer Investigative Branch's undercover investigation that looked for trafficking during the Review Period (the timeframe in which the transaction patterns were derived).  As noted in the Plaintiffs' undisputed facts, the investigation reports read as follow:

a. According to the Department's records, on January 17th of 2017 an unidentified investigator went to the Store and conducted an under-cover investigation.  This is what his report read, "Clerk rang up all the groceries and quoted total.  When I put my card through the turn-style, he asked 'stamps?'  I said 'yeah!'  He said 'cash for this' – holding up the bowls.  I said, 'all I got is stamps!'  He shook his head no – deducting them.  I paid and left the store."  See Report of Negative Investigation attached hereto as **Exhibit K**.

b. A second investigation was conducted on January 23rd, 2017 by presumably the same unidentified investigator who went to the Store to conduct an undercover investigation.  In this investigation, the undercover investigator attempted to

traffick in SNAP benefits – the same violation which the Department alleges was occurring during the timeframe in which the allegations occurred.  The investigator states in his notes, "On the above date, at about [time] I entered the subject store.  As the clerk rang up the items, my issued Electronic Benefits Transfer (EBT) card was where it could be viewed by the clerk.  I gave the clerk the EBT card, which had a total of $156.20 in Supplemental Nutrition Assistance Program (SNAP) benefits.  The clerk deducted $5.24 for items purchased from the investigative EBT account… When I handed the clerk my card, I asked, 'cash $20.00?' He said, 'no,' shaking his head.  I paid and left the store."  See Report of Negative Investigation attached hereto as **Exhibit M.**

If the data analysis method used by the Defendant is supposed to mirror the undercover investigation's results, why don't the two line up in this matter?  Here is direct observation by a Defendant official that there are no indicators of SNAP violations whatsoever during the Review period, but the Department outright ignores the evidence.

**<u>Confirmation Bias</u>**

There is a term in statistics/data analysis that is called "Confirmation Bias" which is when an investigator views contrary evidence or neutral evidence in a manner which would confirm guilt, rather than to view the evidence as either neutral or exculpatory.  See *Roach, Kent, Wrongful Convictions: Adversarial and Inquisitorial Themes (June 1, 2010).* North Carolina Journal of International Law and Commercial Regulation, Vol. 35, 2010.  Confirmation Bias crops up in investigations and statistical studies (it's commonly discussed in scientific papers where data analysis is a driving component of the conclusion), and it appears to have cropped up in the Defendant's analysis of this case.

For example, the Defendant disregarded the RIB investigation that found there were no indicators that trafficking was occurring. The Defendant ignored the higher priced items that were missing from the on-site investigation, and summarily discounted the purchase of infant formula without basis and in contradiction to what the Department's own studies showed. The Defendant routinely cited an absence of "staple foods" as a basis for why participants wouldn't shop at the store, but the Department's studies showed that "staple foods" weren't the most common items that the participants purchased with their SNAP benefits.

The Defendant dismissed the co-shopping explanation for "fast in time" transactions without reasonable basis. The Defendant did mental gymnastics to state both that the Plaintiffs were smart enough to try to break up larger trafficking transactions into several smaller transactions to avoid detection (A.R. 84), but still dumb enough (over the same timeframe) to allegedly run the larger trafficking transactions that resulted in high dollar transactions A.R. 85. This doesn't make sense: either the Defendant believes the Plaintiffs are clever enough to avoid detection by breaking down the transactions, or dumb enough to make large trafficking transactions – the Defendant cannot have it both ways.

The Defendant summarily disregarded the purchase transaction receipts as well, noting that they were not particularly probative, despite the fact that some customers were making similar purchases with cash and debit purchases – supporting the notion that the EBT purchases were legitimate. Overall, any piece of evidence in this matter that was neutral was construed by the Defendant as evidence of guilt, any evidence that supported the Plaintiffs' contention was summarily disregarded or written off without support.

**This is why Discovery in this matter is so important – the presence of conformational bias is difficult to detect when limited just to the Administrative Record, but is more easily**

**uncovered during deposition questioning.**  Coming to the wrong conclusion because "to a hammer, everything looks like a nail" is the wrong approach – and review in this matter is important.

**B.**      **The Government's Motion Relies Almost Entirely on Inadmissible Evidence**

The Government's circumstantial case lacks a sufficient evidentiary basis as a data analysis, which is the fundamental basis for the Government's position, which must be admitted through an expert evaluation as required by Rule 701 of the Federal Rules of Evidence.  No witnesses have been established as experts by the Defendant, therefore scientific, technical or other specialized knowledge may not be considered.  Furthermore, the analysis of the transaction data is specifically at issue in this case, as the undersigned has outlined above.  The Defendant has not provided a sworn statement of any witness who could testify to the veracity or validity of the data evaluation set forth by the Defendant, nor have they provided a statement of material facts. Accordingly, the assertions that remain in the Administrative Record which would be offered for the truth of the matter asserted (that the Plaintiffs are somehow guilty of trafficking) are not admissible as they remain hearsay.

As the Government concedes, this Court's *de novo* review of whether a violation of the Act occurred, *see* 7 U.S.C. § 2023(a)(15), requires that the Government demonstrates the absence of any genuine dispute of material fact in accordance with Rule 56 of the Federal Rules of Civil Procedure.  Under Rule 56(c), the Government must cite material "in a form that would be admissible in evidence."  *See* Fed. R.Civ. P. 56(c)(2).  The burden is on the proponent to show that the material is admissible as presented.  Likewise, the Government's supporting declarations "must be made on personal knowledge, [and] set out facts that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(4).

No such evidence has been submitted by the government to indicate that the patterns are actually accurate, or that the system itself is accurate.  Therefore, the Defendant's motion must be dismissed for insufficiency, even without looking to the Plaintiffs' evidence.

**C.**     **The Government's Statistical Evidence is Inadmissible Lay Opinion Evidence**.

Furthermore, the Government has never identified or proffered an expert on statistics and the statistical significance of why some transactions are considered and some transactions are excluded from the Government's data analysis.  Accordingly, the Government is barred from relying upon expert statistical evidence on summary judgment.  See Fed. R. Civ. P. 26(a)(2) (requiring expert disclosures); Fed. R. Civ. P. 37(c)(1) (providing that failure to make required expert disclosure precludes party's use of such information on motion); Federal Rules of Evidence 701 and 705 (with no expert, no cross examination is possible).

However, ignoring for the moment that the Defendant has failed to comply with the Federal Rules of Civil Procedure or Evidence, and pretending it had offered an expert, expert testimony must be grounded on sufficient data.  More specifically, the data disclosed as the foundation of the expert opinion must be sufficient to demonstrate the scientific validity of the research supporting the conclusions so that the court can determine whether the testimony is well founded.  A district court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *General Electric Co. v. Joiner*, 522 US 136, 147 (1997).  The proper question is whether there is "too great an analytical gap between the data and the opinion proffered."  *Id*.

Even if the Government propounded its conclusions through a properly qualified and disclosed expert, the conclusion would still suffer from two critical flaws on this record: (i) inadequate data to demonstrate that transactions at Plaintiffs' store deviated from statistical expectations (general interviews of unnamed investigators are not the same thing as an analysis of

underlying empirical data), and (ii) any data to demonstrate the statistical significance of any such deviation are meaningful enough to give rise to an inference of wrongdoing.  Such disclosures are essential to assets the probative value of the Government's data.

None of the actual material submitted in support of the Government's summary judgment motion disclose, for any of the two (2) categories of purportedly suspicious transactions, either (i) the extent to which the transactions at Plaintiffs' store deviated from statistical expectations (though summary arguments are abound), or (ii) the statistical significance of any such deviations (context is important: where a retailer operates substantively different than the stores it is compared to, comparison is inappropriate).[27]   The Government provides neither the number of such transactions expected through statistical analysis, nor any measure of the statistical significance of the store's claimed deviation from those expectations.

In the absence of data demonstrating these elements, the Government's conclusions would lack sufficient foundation to support even an expert's conclusions.  The Government simply does not offer any data to substantiate or contextualize its improperly proffered conclusions.  While statistics can be probative, their basis must be sound, and their case studies should be readily ascertainable to verify their accuracy.

For the reasons stated above, the Government's statistical conclusions, which are critical to its motion, cannot support entry of summary judgment.

---

[27] Even general reference to the "state's average" is meaningless if the totality of the data appears to be a reverse bell curve with a statistical mode and distribution having stores on the extreme ends and very few actually operating as "average".

**D.**     **Plaintiffs' Evidence Creates Genuine Disputes of Material Fact That Must Be Resolved at Trial.**

Regardless of whether the Government's statistical evidence is properly before the Court, testimony from various witnesses creates a genuine dispute of fact that forecloses summary judgment.  The Government, for its part, has marshaled circumstantial evidence of potential trafficking through various transactional patterns, and it attempts to poke holes in Plaintiffs' explanations for those patterns.  Plaintiffs, by contrast, gives no credence to the Government's circumstantial evidence, which lacks sufficient foundation to support an inference of wrongdoing. Plaintiffs further provide robust testimonial evidence, beyond their own statements, substantiating their position.  In short, Plaintiffs question the creditability of Defendant's evidence and vice versa; that dispute is a quintessential issue for a jury to decide.  Thus, there is no basis for summary judgment and Defendant's Motion should be denied.

To defeat summary judgment, Plaintiffs must merely produce evidence "such that a reasonable jury could return a verdict for the nonmoving party."  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  This court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Donnelly v. Greenburgh Cent. School Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (internal quotations omitted).  "Summary Judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party". *Id.*

At trial, the Government would seek to put a few statistics before the jury to suggest that certain transactions are anomalies, giving rise to an inference of trafficking.  The fact finder would have, as this Court has, little to no basis for understanding the validity or significance of those anomalies.  Statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted.  Plaintiffs will do exactly that at trial – Plaintiffs and Plaintiffs'

store's customers would all take the stand to testify at trial, to swear that no trafficking occurred and to explain why the purported statistical anomalies cited by the Government are consistent with customer behavior, rather than wrongdoing.   A reasonable fact finder could readily and appropriately conclude, after such a trial, that no trafficking took place.  Plaintiffs are thus entitled to have their day in court.

**E.**     **Summary Judgment is Inappropriate in Light of the Government's Failure to Identify the Customer(s) Who Engaged in the Purportedly Suspicious Transactions.**

The Court should also deny summary judgment, under Rule 56(d), because the Government has failed to provide Plaintiffs with the identities of the SNAP recipients whose transactions the Government has labeled suspicious.  Without this information, Plaintiffs lack the ability to rebut, on a transaction by transaction basis, the claims made by the Government.

Rule 56(d) grants this Court discretion to deny, or defer considering, a summary judgment motion "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d).  The Government has failed to provide Plaintiffs with the identities of the purchasers whose transactions the Government relies upon in charging Plaintiffs with trafficking.  The Government's suggestion that it cannot identify these individuals is not plausible.  Plaintiffs are entitled to this information to further oppose the Government's motion for summary judgment.

The court in *Han v. FNS*, 580 F. Supp. 1564 (D.N.J. 1984) denied summary judgment in similar circumstances.   The owner there complained, as here, that "the identities of. . .[those] who made the purchases in issue were never disclosed to him during administrative proceedings." *Id.* at 1566.  The owner asked the court to deny summary judgment under the precursor to Rule 56(d).  The court agreed, admonishing the Government that "it is singularly inappropriate to shield those

witnesses from disclosure by the bringing of a motion for summary judgment without any accompanying revelation of the identity of those individuals." *Id*. at 1568.

Generally speaking, Summary Judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movement is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact, and judgment as a matter of law should be granted in their favor. *Id*. Once the moving party has met the initial burden, the non-moving party must offer more than a mere scintilla of evidence to survive summary judgment. See *Roger Witmore's Auto Servs. v. Lake County, Ill*, 424 F.3d 659, 667 (7th Cir. 2005).

In ruling on a motion for summary judgment, only admissible testimony having probative force is to be considered. As in general, summary judgment testimony that simply reflects legal conclusions is inadmissible. Thus, again, for example, the Defendant's motion reflects that there are no genuine issues of material fact and thus is an inadmissible legal conclusion. This Court should deny the Government's motion for summary judgment for the same reasons adopted in *Han*.

## VII.   <u>CONCLUSION</u>

The Court should **DENY** the Government's motion to dismiss and motion for summary judgment in all respects. The Plaintiffs have presented sufficient evidence in this matter to establish that (1) the fast in time transactions are a result of SNAP household purchasing habits and preferences, and that the transactions themselves are not recorded at the actual time of sale, and (2) that the large transactions are a result of the store's inventory and SNAP participant's inventory purchasing preferences. Furthermore, the data relied upon by the Government is: (1)

not admissible as presently presented; (2) inherently flawed as the result of insufficient statistical basis; (3) is directly contradicted by its own empirical data; (4) is known to have had Unspecified Discrepancies during the timeframe upon which the Defendant presently bases its case; and (5) is fundamentally incomplete in its analysis and presentation for lack of providing supporting data, and meaningful comparisons to the Plaintiffs' Store.

In the event the Court determines that it should not deny the Motion for Summary Judgment, a decision on the matter should be postponed until such time as the Plaintiffs can retrieve the remainder of the discovery necessary in this case.  See the attached 56(d) Declaration signed by the undersigned counsel which outlines the additional discovery needed and the efforts taken to collect discovery to date.

Furthermore, the Plaintiffs request this Court grant them an opportunity to respond to the Defendant's reply brief in this matter.

Respectfully submitted

Dated:  August 6, 2018

*Andrew Z. Tapp*

Andrew Z. Tapp, Esquire
Florida Bar Number:  68002
Pro Hac Vice
Metropolitan Law Group, PLLC
1971 W. Lumsden Road, #326
Brandon, Florida 33511-8820
Telephone:  (813) 228-0658
Andrew@Metropolitan.legal
Lajeana@Metropolitan.legal

**COUNSEL FOR PLAINTIFFS**