EXHIBIT "C"

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| **BETESFA, INC.,** a District of Columbia Corp**. d/b/a ABG MART**, and **BETELHEM KEBEDE GESESSE,** an Individual, <br><br>                    Plaintiffs, <br><br> v. <br><br> **UNITED STATES OF AMERICA**, <br><br>                    Defendant. | **CIVIL ACTION NO.  18-394 (RDM)** <br><br> **PLAINTIFF, BETELHEM KEBEDE GESESSE'S, AFFIDAVIT IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff, BETELHEM KEBEDE GESESSE, a natural person, hereby swears and affirms that the following statements are true and accurate to the best of his knowledge and belief.

1. Plaintiff, Betelhem Kebede Gesesse, is the owner and manager of BETESFA, INC., A District of Columbia Corp., D/B/A ABG MART (hereinafter "**ABG Mart**").

2. ABG Mart is a small retail food store located in Washington, DC that accepts Supplemental Nutrition Assistance Program ("SNAP") benefits.

3. As part of my store's participation in SNAP, I along with the Store's employees have reviewed the EBT training materials and are well versed in the regulations and specifically separate eligible and ineligible items when they are

presented for purchase, then we process the EBT transaction and the ineligible item transaction separately.

4.  From January 2017 through May 2017 (a six month time span), I, along with all employees of the store were all aware of the rules, and were in the habit of routinely separating transactions into "eligible" and "ineligible" piles.

5.  It is my policy that no violations of the SNAP regulations will be permitted in my store.  Accordingly, I am careful to comply with the regulations.

6.  It is my policy, to refuse to sell ineligible items on SNAP.

7.  It is my policy, to refuse cash back on SNAP.

8.  It is impossible for me to address the allegations that are set forth in Attachments 1 and 2 of the Department's Charging Letter, as the Defendant has refused to identify any other information against which we could rebut the allegations.

9.  As I have been present for nearly all EBT transactions at the store, and have personally observed the process described herein above.

10.  As part of running ABG Mart, I am primarily responsible for making business decisions for the store pertaining to the acquisition and pricing of food, packaging of eligible items, and overseeing the operation of the Electronic Benefits Transfer (EBT) system.  As such, I have an intimate knowledge of the business' operations and transactions.

11. At my direction, ABG Mart offers chicken, beef patties, chicken tenders, Jamaican Beef Patties, chicken wings, sausage, butter, ice-cream, juice, milk, cheese, eggs, cereals, and a number of boxed frozen meats.

12. Some examples of foods that my store offers are:

    a. a box of 12 frozen burgers (which the individual patties can be bought separately for $3.00) will be sold for $25.00 instead of $36.00 (their cost individually);

    b. chicken tender bags typically sell for $30.00 (each large chicken tender sells frozen for $2.50);

    c. cases of soda are sold in bulk for whole dollars (depending upon the type of soda, price varies);

    d. prepared sandwiches;

    e. Enfamil for $24.99; and

    f. Chicken Wings for $25.99.

13. ABG Mart is open 24 hours unlike any of the surrounding stores.

14. Many of my SNAP customers purchase foods with other family members in the store to help them carry the items out, or they will bring bags or their own carts to transport the items back to their homes.

15. I interview my customers routinely to ask what additional items they would like to my store to stock, and will then offer them for sale as long as there is a demand for the items.

16. The vast majority of the store's business comes from these customers, and as such, most of the store's business is EBT driven.

17. Participants regularly skip local big brand stores and shop at my store because of our location and hours of operation.

18. Much of our advertising to SNAP participants was word-of-mouth. When participants were happy with our selection, they would tell their neighbors and friends, who would also come to the store.

19. I have an *average* markup of 35% on my inventory.

20. With respect to pricing, our store offered flat or whole numbered pricing for a majority of our food items, including some of our larger items. Accordingly, many of our purchases ended up with whole dollar amounts, and some of them ended up with totals of several hundred dollars.

21. Other times, the clerk has the ability to round transaction amounts or item prices to facilitate faster transactions in the store as a result of either a large quantity of items or a larger number of people in the store.

22. At no time did I, or any other person associated with my store commit trafficking. The transactions that are listed by the Defendant in its charging letter are legitimate purchases of eligible items, nearly all of which can be reproduced when looking through my store's inventory.

23. Furthermore, the representations I made in my response to the Charging Letter and the subsequent Administrative Appeal are true and accurate to the best of my knowledge, or were true and accurate to the best of my knowledge at the time I made them.

Further the Affiant sayeth not.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**Under penalties of perjury, I declare that I have read the foregoing affidavit and that the facts stated in it are true and accurate to the best of my knowledge.**

_____
**BETELHEM KEBEDE GESESSE**

**DATED:** 08/02/18