| | |
|---|---|
| BETESFA, INC., *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 18-0394 (RDM) |
| UNITED STATES OF AMERICA, | |
| *Defendant.* | |

## MEMORANDUM OPINION AND ORDER

This is an action seeking to set aside a decision by U.S. Department of Agriculture's ("USDA") Food and Nutrition Service ("FNS") permanently disqualifying ABG Mart, a convenience store located in Washington, D.C., from participating as an authorized retailer in the Supplemental Nutrition Assistance Program "(SNAP")". Under 7 U.S.C. § 2021, the FNS is required permanently to disqualify a retail food store from participating in the SNAP if the store has engaged in "trafficking in [SNAP] coupons or authorization cards" and if the store does not qualify for the discretionary imposition of a civil monetary penalty "in lieu of disqualification." 7 U.S.C. § 2021(b)(3)(B). An aggrieved store may seek judicial review of a final determination of disqualification, and review is by "a trial de novo" to "determine the validity of the questioned administrative action in issue." 7 U.S.C. § 2023(a)(15).

After the FNS issued a final agency decision permanently disqualifying ABG Mart from participating in the SNAP, the store and its owner (collectively "Plaintiffs") brought this action, alleging that they did not traffic in SNAP benefits and seeking to set aside the agency's action. Dkt. 1. In response, the government moves to dismiss for failure to state a claim, Fed. R. Civ. P.

12(b)(6), or, in the alternative, moves for summary judgment.  Dkt. 10 at 1.  For the reasons set

forth below, the Court will deny the government's motion.

## I.  BACKGROUND

**A.      Statutory Background**

SNAP is a government program operated by the FNS pursuant to 7 U.S.C. §§ 2011–2036.

*See* 7 C.F.R. § 271.3.  The program's mission is "in order to promote the general welfare, to

safeguard the health and well-being of the Nation's population by raising the levels of nutrition

among low-income households."  7 U.S.C. § 2011.  To achieve this mission, SNAP supplements

low-income families' food-purchasing funds in the form of an electronic benefit transfer

("EBT") card, which operates like a debit card and can be used only for the purchase of food at

approved SNAP retailers.  *Id.* §§ 2013(a), 2016(j).

Approved SNAP retailers have one or more EBT terminals, which the retailer uses to

swipe the SNAP beneficiary's EBT card when that beneficiary is making a SNAP-eligible

purchase.  The beneficiary enters a personal identification code on the terminal's keypad, and the

amount spent on the corresponding purchase is deducted from the beneficiary's EBT card

balance.  The EBT terminal generates a receipt for each transaction, and the purchase amount is

credited to the retailer's bank account within two business days.  The FNS can monitor SNAP

retailers' EBT transactions electronically.  *See* 7 C.F.R. § 278.6.

SNAP retailers are subject to a range of regulatory requirements.  *See id.*  Of particular

relevance here, the FNS may permanently disqualify a SNAP retailer that it finds is "trafficking"

in SNAP benefits.  *Id.*  "Trafficking" is defined in relevant part as "buying, selling, stealing or

otherwise effecting an exchange of SNAP benefits issued and accessed via [EBT] cards . . . for

cash or consideration other than eligible food, either directly, indirectly, in complicity or

collusion with others, or acting alone." *Id.* § 271.2. A finding of trafficking must be based on evidence, which "may include facts established through on-site investigations, inconsistent redemption data, evidence obtained through a transaction report under an [EBT] system, or the disqualification of a firm from the Special Supplemental Nutrition Program for Women, Infants and Children." *Id.* § 278.6(a). If a retailer is found to have trafficked in SNAP benefits, that retailer is permanently disqualified from future participation. *Id.* The FNS may, in its discretion, impose "a civil money penalty in lieu of a permanent disqualification," but only if the retailer requests consideration of this alternative penalty within ten days, *id.* § 278.6(b)(2)(iii), and if the retailer meets various criteria, *see id.* § 278.6(i).

The statute and regulations also provide for administrative and judicial review of an FNS decision to disqualify a SNAP retailer. 7 U.S.C. § 2023(a). First, the FNS must send the retailer written notice of its initial decision, upon the receipt of which the retailer may ask the FNS to review that initial decision. *Id.*; 7 C.F.R. § 279. Upon completion of the review, FNS renders a "final determination" and notifies the retailer, at which point the retailer may seek judicial review in state or federal court. *See* 7 U.S.C. § 2023(a)(13); 7 C.F.R. § 279.

**B.      Factual and Procedural Background**

The present dispute began when the FNS's electronic alert system identified "patterns" of EBT transactions at ABG Mart that were "consistent with possible EBT trafficking violations." AR 72. Based on this finding, the FNS Retailer Operations Division began an investigation. *Id.* An FNS contractor visited the store on April 15 and June 17, 2017. AR 30–70. The contractor found one EBT terminal at the store, AR 31, 50, minimal counter space at the check-out area, AR 44, 46, 60, 63, no carts or baskets available to carry items around while shopping, AR 30, 49,

and no high-priced food items for sale, AR 31, 33, 50, 52.[1]  The FNS also compared the store's

transactions to those of other stores in the area, including five other convenience stores within a

1.64-mile radius of the store, and found that ABG Mart had "the highest total transactions and

highest dollar volume [and] highest amount of scan flag hits" among the five local convenience

stores.  AR 86–89.  The FNS then analyzed all the information gathered during its investigation

and determined that the transaction data "established clear and repetitive patterns of unusual,

irregular, and inexplicable SNAP activity, which would warrant issuance of a trafficking charge

letter."  AR 99.

ABG Mart's suspicious transactions fell into two categories: (1) "[r]apid [a]nd

[r]epetitive [t]ransactions [i]n [a] [s]hort [p]eriod [o]f [t]ime" from the "[s]ame

[h]ousehold/[a]ccount," and (2) "[h]igh [d]ollar [t]ransactions.  AR 84–85, 104–11.  The FNS

considered these transactions to be inconsistent with the transactions at other similarly situated

SNAP retailers, which had similar average dollar transaction sizes but fewer high dollar

transactions and, at most, around half the total SNAP transaction volume.  AR 89–91.  In

reviewing the shopping patterns of four households that were involved in suspicious transactions

at the store, the FNS found that their average transaction sizes at the store were over $50.00—

well above the $7.76 average transaction size for convenience stores in the District of Columbia.

AR 93–99.  Furthermore, the FNS found that those same households were also shopping at larger

---

[1]  The four most expensive SNAP-eligible food items the contractor found in June 2017 were a
$7.99 package of frozen chicken, a $6.50 container of infant formula, a $6.50 package of bacon,
and a $5.99 jar of mayonnaise.  AR 50, 52.

stores, often within a day or two of shopping at ABG Mart, demonstrating that the store's customers had access to stores with larger inventories.[2]  *Id.*

On July 17, 2017, the FNS sent a letter to ABG Mart indicating that the store was being charged with trafficking in EBT benefits.  AR 101–03.  The letter explained that ABG Mart had a right to explain the suspicious charges and a right—within ten days—to request a civil money penalty in lieu of permanent disqualification.  *Id.* at 101.  Betelhem Gesesse, the owner of ABG Mart, requested and received additional time to respond, although he was cautioned that the extension did not apply to the time to request a civil money penalty in lieu of disqualification.  AR 114.  On August 10, 2017, Gesesse responded to the charge letter, offering 24 pages of cashier receipts but asserting only that the charges were often multiples of the same item and that, going forward, he would scan each item individually.  AR 117–42.  The FNS analyzed the receipts that Gesesse provided and concluded that they did not explain the suspicious transactions.  AR 143–49.  On September 6, 2017, the FNS issued a determination letter informing Gesesse and ABG Mart that it found that the store had engaged in trafficking and that the store was therefore permanently disqualified from participation in the SNAP.  AR 150.

Gesesse and ABG Mart sought administrative review of the agency's decision, and, through counsel, submitted a brief on January 2, 2018.  AR 162–78.  The only additional evidence that Gesesse and ABG Mart submitted was several pages of 2016 D.C. and federal tax returns, AR 179–91, which they included to show their significant inventory and sales numbers.[3]

---

[2]  Within a two-mile radius of the store, there were 61 SNAP-authorized retailers, including 37 convenience stores, 5 small grocery stores, 2 supermarkets, and 3 superstores.  AR 86.

[3]  Plaintiffs argued that the FNS had underestimated the store's sales by relying on yearly estimates of $14,400 in SNAP-eligible food item sales and $18,000 in gross sales.  AR 164–65.  Those estimates were derived from Plaintiff's own application to participate in SNAP, however,

The brief argued that the store's inventory and customer shopping patterns explained the repetitive and high-dollar transactions. AR 163–64. In doing so, it made a number of assertions: The brief asserted that the store was open 24 hours a day, A.R. 163; that it sold frozen meat and soda in bulk for whole dollar amounts, AR 164; and that the highest-priced items it sold were a box of frozen burgers for $25 and a bag of chicken tenders for $30, AR 164, 168. The brief also asserted that the store sold cold, pre-made sandwiches, at least four of which appear to be viewable in a store visit photo. AR 41, 168. And, based on the receipts provided by Gesesse, the brief asserted that items were sometimes "rounded down as a courtesy to the customer." AR 174.

With respect to customer shopping patterns, Gesesse and ABG Mart asserted that SNAP households redeem most of their benefits within two weeks of the month, as documented by FNS in a 2011 USDA publication. AR 165, 172. They noted that, in line with that pattern, most of the allegedly suspicious repetitive transactions occurred within the first ten days of the month. AR 173; *see* AR 104–07. They asserted that household members frequently "co-shopped," which meant that they either shopped separately using the same SNAP account or shopped at the same time but separated their purchases into multiple transactions at the store. AR 172. Gesesse and ABG Mart also claimed that customers would sometimes return to the store for a second purchase after forgetting an item and that unemployed individuals bought meals at the store and ate them outside, explaining their frequent purchases throughout the day. AR 166–67. They cited, but did not provide, an industry study showing that shoppers at small grocery and convenience stores are loyal to their store and sometimes shop at the same store on a daily and

_____

in which he estimated $1,500 in monthly gross sales, of which 80% were SNAP-eligible food items. AR 13, 204–05.

weekly basis. AR 165–66. They also cited, but did not provide, another industry study finding that more shoppers were using convenience stores as their primary grocer. AR 167.

Finally, Gesesse and ABG Mart took issue with the FNS's use of an electronic alert system and its process for disqualifying retailers. To that end, they argued that it was internally inconsistent for the agency to flag both small, repetitive and large transactions as suspicious. AR 174–75. They also asserted that these patterns were statistically meaningless and not confirmed by undercover investigations. AR 176. And, more generally, Gesesse and ABG Mart attacked the FNS's electronic alert system as overused, unduly trusted, and "not always accurate as the numbers fail to account for special business practices, differences in demographics and foodstuffs, and geographic areas." AR 170. Finally, they asserted that the FNS lacked a "meaningful comparison store" and did not have enough understanding of the ABG Mart's business to identify fraud. AR 177.

An Administrative Review Officer ("ARO") of the FNS reviewed the arguments and materials Gesesse and ABG Mart submitted and issued a Final Agency Decision on January 18, 2018. AR 194–207. The ARO found, among other things, that the store's physical characteristics and inventory did not lend itself to the many large, suspicious transactions at issue. AR 200. He also noted that Gesesse and ABG Mart's theories about customer shopping patterns could not explain the nature of the transactions at issue, many of which clustered around $100 and other five-dollar increments—a fact that was in itself suspicious. AR 108–11, 203. Therefore, the ARO upheld both the decision that trafficking had occurred and the decision to disqualify the store permanently from the SNAP program. AR 207.

Plaintiffs now seek judicial review of that final determination pursuant to 7 U.S.C. § 2023(a)(13)–(17).

## II.  LEGAL STANDARD

### A.  Motion to Dismiss, or, in the Alternative, for Summary Judgment

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint," *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002), and in evaluating such a motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face,'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)) (alterations in original) (internal citation omitted).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [that if] accepted as true, [would] 'state a claim to relief that is plausible on its face,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56 (first quote quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  In considering a motion to dismiss for failure to state a claim, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997)).

In general, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986);

*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). "A fact is 'material' if" it may "affect the outcome" of the litigation. *Holcomb*, 433 F.3d at 895; *Liberty Lobby*, 477 U.S. at 248. A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007); *Holcomb*, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

**B.      Judicial Review of an FNS Decision to Disqualify a SNAP Retailer**

Under 7 U.S.C. § 2023(a)(15), an FNS final determination is reviewable in federal or state court by "a trial de novo . . . in which the court shall determine the validity of the questioned administrative action in issue." "If the court determines that such administrative action is invalid, it shall enter such judgment or order as it determines is in accordance with the law and the evidence." *Id.* § 2023(a)(16).

"A trial de novo is a trial which is not limited to the administrative record—the plaintiff 'may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency.'" *Affum v. United States*, 566 F.3d 1150, 1160 (D.C. Cir. 2009) (quoting *Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997)). "The trial *de novo* provision of the Act 'is clearly broader than the review standard provided for under the Administrative Procedure Act [("APA")];" unlike in a standard APA case, "[i]t requires the district court to examine the entire range of issues raised, and not merely to determine whether the administrative findings are supported by substantial evidence.'" *Id.* (quoting *Modica v. United States*, 518 F.2d 374, 376 (5th Cir. 1975)). The trial *de novo* requirement "is compatible with a summary judgment disposition," however, "if there are no material facts in dispute." *Id.*

(quoting *Freedman v. USDA*, 926 F.2d 252, 261 (3d Cir. 1991)).  Those circuits that have

considered the issue have held that the burden of proof is "placed upon the store owner to prove

by a preponderance of the evidence that the violations did not occur."  *Kim*, 121 F.3d at 1272;

*Plaid Pantry Stores, Inc. v. United States*, 799 F.2d 560, 563 (9th Cir. 1986); *Warren v. United*

*States*, 932 F.2d 582, 586 (6th Cir. 1991); *Goodman v. United States*, 518 F.2d 505, 507 (5th Cir.

1975).

Although the validity of the underlying violation is reviewed by trial *de novo*, "judicial

review of the agency's choice of penalty is focused on whether the [FNS] abused [its]

discretion."  *Affum*, 566 F.3d at 1162.  Under that deferential standard of review, the court must

consider whether the FNS's "choice of a penalty . . . [was] either 'unwarranted in law' or

'without justification in fact,' or [was otherwise] 'arbitrary' or 'capricious.'"  *Id.* at 1161

(internal citations omitted).

## III.  ANALYSIS

### A.      Motion to Dismiss

The government first argues that the complaint should be dismissed for failure to state a

claim upon which relief can be granted.  Dkt. 10 at 28–29.  That contention fails because "it

focuses primarily on the evidence that has been submitted rather than on the extent to which

Plaintiff[s] ha[ve] stated a claim."  *Morgan v. United States*, 72 F. Supp. 65, 73 (D.D.C. 2014).

Plaintiffs allege in their complaint that the transactions at issue "were *bona fide* purchases of

food items, in exchange for SNAP benefits as the system was intended" and that "the [s]tore was

not at any point in time, engaged in trafficking SNAP benefits."  Dkt. 1 at 9 (Compl. ¶ 44).

These factual allegations are "enough to raise a right to relief above the speculative level, on the

assumption that all the allegations in the complaint are true," and they are sufficient to "give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (ellipsis in original).

Accordingly, the Court will deny Defendant's motion to dismiss.

**B.      Motion for Summary Judgment: The Finding that Trafficking Occurred**

Defendants' motion for summary judgment presents a closer question. To demonstrate that the store trafficked in SNAP benefits, the government points to 246 allegedly suspicious transactions that the EBT database documented over a five-month period in 2017, AR 104–11, as well as reports of inadequate store infrastructure and inventory to support those large and successive transactions. The transaction data shows that the following occurred during the relevant timeframe:

The data reflects 26 sets of transactions that involved one benefit account making two or more convenience store purchases totaling over $100 in under 24 hours. AR 104–07. Of those, 13 sets were completed in under 10 minutes, 9 of which were completed in 2 minutes or less. *Id.* As for large transactions, the data shows that the store participated in 186 transactions of $31 or more, including 98 transactions over $50 and 32 transactions over $100. AR 108–11. By way of comparison, the average convenience store purchase in the District of Columbia during the review period was $7.76. AR 95. The store also redeemed between 2 and 17 times more in SNAP benefits than five SNAP-authorized convenience stores located nearby. AR 90–91.

Plaintiffs, on the other hand, argue that the evidence is far from clear cut and that there are genuine disputes of material fact that must be resolved at trial. They have also filed a declaration pursuant to Federal Rule of Civil Procedure 56(d), seeking discovery of all information upon which the original disqualification decision was made; information related to the households identified in the charging letter; information related to all the stores that the FNS

11

used as comparators; investigative reports pertaining to the Plaintiffs, statistical and investigative

case studies upon which the FNS relied; and internal agency documents and training materials.

Dkt. 21-2 at 2–6. In addition, Plaintiffs seek leave to take depositions of certain USDA

witnesses. *Id.* at 7.

First, Plaintiffs dispute that the 246 allegedly suspicious transactions demonstrate that the

store was trafficking in SNAP benefits. Dkt. 21 at 31–32 (Pl. Resp. to Def. Mot. at 24–25).

With respect to the 26 sets of EBT transactions that occurred in rapid succession from the same

account, they argue that their customers engage in co-shopping, which occurs when two or more

adults in one household make separate purchases—using the same account—for logistics or

budgeting purposes. AR 172. With respect to the 186 EBT transactions exceeding $31, they

argue that their customers often buy items in bulk, Dkt. 21 at 28 (Pl. Mem. in Supp. of Opp. at

21), and they include declarations from nine customers attesting that they make "large

purchases" at the store and identifying items that they purchase, *see* Dkt. 23-2. Without data

matching particular customers to the allegedly suspicious transactions, Plaintiffs contend that

they cannot reasonably rebut each set of transactions upon which Defendants rely. Dkt. 21 at

18–19, 31 (Pl. Mem. in Supp. of Opp. at 11–12, 24); *see Sue Tha Lei Paw v. United States*, No.

17-cv-0528, 2018 WL 1536736, at *4 (S.D. Cal. March 29, 2018) ("Without access to data

matching [Plaintiff's] customers to the underlying suspicious transactions, Plaintiffs cannot

reasonably account for [instances of sequential purchases].").

Second, Plaintiffs dispute that the store's comparatively higher volume of EBT

transactions constitutes meaningful evidence of trafficking. Dkt. 21 at 37 (Pl. Mem. in Supp. of

Opp. at 30). They argue that the store provides the items that its customers wish to purchase and

that their good customer service "generat[es] word-of-mouth business." *Id.* Plaintiffs also

contend, once again, that they are operating at a disadvantage without the benefit of discovery because they cannot reasonably differentiate the ABG Mart from other stores in the area without more information about the comparator stores upon which Defendant relies.

Third, Plaintiffs dispute that ABG Mart's infrastructure and inventory is insufficient to support the large and rapid transactions the FNS investigation revealed. They argue that, even though the store does not have shopping carts or baskets, their customers transfer items using their own bags or with the assistance of friends or other household members. They also point to a series of receipts from the relevant period, tax records, and some inventory invoices to argue that their customers' purchases are consistent with their inventory and total receipts. *Id.* at 35–36 (Pl. Mem. in Supp. of Opp. at 28–29).

Finally, Plaintiffs rely upon the declaration of Betelhem Gesesse, the owner and manager of the ABG Mart, attesting that the store did not traffic in SNAP benefits and that every transaction at issue was, in fact, legitimate. Dkt. 22-2 at 5 (Gesesse Decl. ¶ 22) ("At no time did I, or any other person associated with my store commit trafficking. The transactions that are listed by the Defendant in its charging letter are legitimate purchases of eligible items, nearly all of which can be reproduced when looking through my store's inventory."). As the owner and manager of the store, Gesesse has "been present for nearly all EBT transactions at the store," has "an intimate knowledge of the business'[s] operations and transactions," and sets the store's "policy that no violations of the SNAP regulations will be permitted." *Id.* at 3 (Gesesse Decl. ¶ 9–10).

Defendant, in response, argues that the store has failed to establish the legitimacy of even a single transaction that the agency identified by date and time (and partial household number) as a violation, despite the requirement that, "[t]o survive summary judgment, a plaintiff in a Food

Stamp Program disqualification case must raise material issues of fact as to *each* alleged

violation." *McClain's Mkt. v. United States*, 214 F. App'x. 502, 505 (6th Cir. 2006) (emphasis in

original); *see also Tony's Pantry Mart Inc. v. United States*, No. 15 C 2967, 2017 WL 514184, at

*5 (N.D. Ill. Feb. 8, 2017) ("Such specificity is required because 'permanent disqualification is

warranted on "the first occasion" of coupon trafficking, [thus] it is Plaintiff's burden to raise

material issues of fact as to each of the transactions set forth as suspicious by the FNS.'"

(quoting *Kahin v. United States*, 101 F. Supp. 2d 1299, 1303 (S.D. Cal. 2000))); *McClain's Mkt.

v. United States*, 411 F. Supp. 2d 772, 777 (N.D. Ohio 2005) (store owner's "affidavit presents

no explanation of any of the 149 transactions asserted against plaintiff, but merely presents

general justifications for large expenditures. Any one of the 149 transactions is sufficient to

establish a violation.").

  Although the FNS has identified substantial evidence in support of its decision, and,

although Plaintiffs' evidence is far from overwhelming, "[s]ummary judgment is appropriate

only if the [record] show[s] that 'there is no genuine dispute as to any material fact.'" *Colbert v.

Tapella*, 649 F.3d 756, 758 (D.C. Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  Under the statutory

standard of review applicable here, moreover, the Court will eventually need to decide—de

novo—whether ABG Mart trafficked in SNAP benefits.  At this stage of the proceeding,

however, the Court's role is limited to determining whether Plaintiffs have marshalled sufficient

evidence to give rise to a genuine dispute of material fact on that question.  The Court concludes

that they have done so.

  To be sure, "in appropriate cases, [transaction information from EBT databases and on-

site investigation reports] may be sources of circumstantial evidence of fraud, sufficient to prove

that a store is trafficking in SNAP benefits." *Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 379

(1st Cir. 2018); *see also Fells v. United States*, 627 F.3d 1250, 1251, 1254 (7th Cir. 2010)

(affirming a finding of trafficking based on data showing that store regularly processed purported

SNAP transactions for large amounts that were suspicious given the store's inventory and size

and data "about customer purchasing patterns at surrounding stores"); *Idias v. United States*, 359

F.3d 695, 698 (4th Cir. 2004) (affirming a finding of trafficking when redemption data showed

that small store regularly processed high-dollar SNAP transactions in rapid succession and

SNAP debits occasionally "exceeded the store's documented total sales").  Here, however, the

FNS relies on inferences that can be drawn from purchasing patterns, while Plaintiffs offer a

statement made—under the penalty of perjury—that no illegitimate transactions occurred.  Dkt.

22-2 at 7 (Gesesse Decl).  Although an unadorned denial, standing alone, might not be sufficient

to withstand a motion for summary judgment, Plaintiffs also reasonably seek discovery regarding

the comparators that FNS used and the methodology it employed in determining that Plaintiff

committed trafficking.  The Court has reviewed Defendant's submission, including the report

prepared by the FNS Investigative Analysis Branch, AR 71–99, and agrees that the bases for the

comparisons that the FNS draws are not always obvious or explained in sufficient detail to

permit a thorough response.

Under these circumstances, the Court concludes that Plaintiffs should be provided an

opportunity to develop and to present their case on the merits.  *See Sue Tha Lei Paw*, 2018 WL

1536736, at *4; *see also ANS Food Mkt. v. United States*, No. 14-2071, 2015 WL 1880155, at

*3–4 (D. Md. Apr. 22, 2015) (denying defendant's motion for summary judgment and permitting

further discovery because the evidence was not "undeniable" and plaintiff submitted a Rule

56(d) affidavit); *see also Rodriguez Grocery & Deli v. United States*, No. 10-1794, 2011 WL

1838290, at *5–6 (D. Md. May 12, 2011) (denying defendant's motion for summary judgment

and granting discovery despite strong evidence of trafficking because certain data used by the

agency in making its determination remained within its exclusive control). The Court does not

doubt that the FNS has presented substantial evidence in support of its determination. But,

Plaintiffs are entitled to de novo review before this court, and, under that standard, they have

submitted sufficient evidence and have raised sufficient arguments justifying discovery to fend

off the government's motion for summary judgment. The Court will, accordingly, set a schedule

for targeted and reasonable discovery, and, if necessary, for a bench trial on the merits.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss, or, in the alternative, for

summary judgment, Dkt. 10, is **DENIED**.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date: September 17, 2017